UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JUAN CANDELARIA,

       Plaintiff,

  -v-                                                              No. 01 Civ. 8594 (LTS)(RLE)

ST. AGNES HOSPITAL,

       Defendant.

-------------------------------------------------------x

## MEMORANDUM OPINION AND ORDER

        This is an action arising out of medical treatment that New York state prison inmate Plaintiff Juan Candelaria ("Plaintiff" or "Candelaria") allegedly received at Defendant St. Agnes Hospital ("Defendant" or "St. Agnes") while he was in state custody.  In his Amended Complaint ("Complaint") Plaintiff asserts a claim under 42 U.S.C. § 1983, alleging deliberate indifference to Plaintiff's serious medical needs in violation of Plaintiff's rights under the Eighth and Fourteenth Amendments.  The Court has previously construed the Complaint to also assert a state law medical malpractice claim against St. Agnes.  The Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

        St. Agnes moves for summary judgment on Plaintiff's claims, and Plaintiff moves for sanctions for St. Agnes's alleged spoliation of evidence and to preclude St. Agnes from introducing certain evidence at trial.  On December 4, 2009, the Court held oral argument on the motion for summary judgment and the motion for spoliation sanctions.  The parties thereafter made post-argument submissions.  The Court has considered carefully the parties' submissions and arguments and, for the following reasons, grants St. Agnes's motion with respect to the Section

1983 claim, declines to exercise supplemental jurisdiction of the state malpractice claim, and denies Plaintiff's motions as moot.

## BACKGROUND

The following material facts are undisputed unless otherwise indicated.[1]  In August of 1997, while an inmate at Green Haven Correctional Facility, Plaintiff underwent a series of laboratory studies which revealed higher-than-normal levels of BUN and creatinine.  (Decl. of Adam B. Siegel ("Siegel Decl."), Ex. D, Report of Jeffrey Silberzweig, M.D. ("Silberzweig Report") at 1 (relating findings of Dr. Bendheim)[2].)  According to prison records, the physician assigned to treat Plaintiff noted that "old labs [had] not show[n] these abnormalities."  (Silberzweig Report at 1.)  Plaintiff's elevated serum creatinine level persisted and after several weeks he was diagnosed with "acute renal failure with emesis in a patient with a neurogenic bladder"[3] and, on August 25, 1997, was brought to the Emergency Department at St. Agnes. (Id. at 2; Def.'s 56.1 St. ¶ 1; Pl.'s 56.1 St. ¶ 1.)  St. Agnes, a now defunct entity, treated Candelaria pursuant to a contract with the New York State Department of Correctional Services ("NYSDOCS").  (Siegel Decl., Ex. N., agreement between St. Agnes and NYSDOCS ("DOCS Contract").)

Upon admission to St. Agnes, Plaintiff was initially seen by Dr. Snehal Vyas.  Dr.

---

[1]  Citations to the parties' respective S.D.N.Y. Local Civil Rule 56.1 statements ("__ 56.1 St.") incorporate by reference citations to the underlying evidentiary submissions.

[2]  The parties' submissions include many medical documents that are difficult for the Court to interpret but on which Dr. Silberzweig's account of the treatment that St. Agnes provided to Plaintiff is based.  Neither party contests Dr. Silberzweig's account, therefore the Court relies on it for the purpose of relating the content of relevant medical notes and records.

[3]  Plaintiff is a paraplegic, and, as a result of his injury, developed a neurogenic bladder.  Having a neurogenic bladder required Plaintiff to rely on a process of self-catheterization in the years preceding his stay at St. Agnes.  (Compl. ¶ 4.)

Vyas noted Plaintiff's past history of hypertension and his need for self-catheterization. (Silberzweig Report at 2.) Dr. Vyas noted that Candelaria had "acute kidney injury" and suggested possible causes including "reduction of glomerular filtration pressure due to treatment with Vasotec" and "dehydration." (Id.) Dr. Vyas ordered intravenous ("IV") hydration and a renal ultrasound, and requested an evaluation by Renal Services. (Id.) Dr. Vyas also ordered that Plaintiff's "Is and Os," or fluid input and output, be monitored in order to assess the suitability of continued IV hydration. The next day, August 26, 1997, Dr. Lynda Ann Marie Szcezch, a renal specialist, saw Candelaria. (Pl. 56.1 St. ¶ 2.) After noting Plaintiff's past history of hypertension and after reviewing, among other things, the initial renal ultrasound, Dr. Szcezch diagnosed Candelaria with "acute on chronic renal failure." (December 11, 2009, Decl. of Adam Siegel ("Siegel Supp. Decl."), Ex. E ("Szcezch Notes 8/26/97"), at ST.AG000023; Silberzweig Report at 2.) Dr. Szcezch speculated that the chronic component of Candelaria's kidney failure was caused by a glomerular process and that the acute component might be due to "vasomotor issues related to ACEI" or an "exacerbation of the underlying disease." (Silberzweig Report at 2.) She "suggested" a second renal ultrasound and an number of additional serologic studies. (Id.) The following day, August 27, 1997, Dr. Szcezch saw Plaintiff again, interpreted certain new laboratory results "to indicate moderate renal impairment" and ordered a urinalysis. (Id. at 2-3.) Dr. Vyas also saw Plaintiff on that day and discontinued the IV fluids. (Id. at 3.)

Dr. Szcezch saw Plaintiff on August 28, 1997, as did a Dr. Haber, and "had no new recommendations." (Silberzweig Report at 3.) On August 29, 1997, Dr. Szcezch received the results of the urinalysis. (Id.) She made a "presumptive diagnosis of [focal segmental glomerulosclerosis]" ("FSGS") and "discussed the prognosis for Mr. Candelaria's renal disease with him and discussed the possibility of a renal biopsy" to conclusively identify the various

components of Plaintiff's kidney disease.  (Id.; see also Siegel Decl., Ex. H., Tr. of Dep. of Dr. Szcezch ("Szcezch Dep.") at 59:16-60:5.)  Dr. Haber also saw Plaintiff that day and "noted that the renal ultrasound showed no renal vein thrombosis."[4]  (Silberzweig Report at 3.)  It appears from Dr. Silberzweig's report that Dr. Szcezch did not review the ultrasound herself.  On September 1, 1997, Dr. Anjani Dubey, a nephrologist (see Def.'s 56.1 St. ¶ 51; Pl.'s 56.1 St. ¶ 51), reviewed the August 29, 1997, urinalysis results.  (Silberzweig Report at 3.)  The next day, September 2, 1997, Dr. Szcezch saw Plaintiff and noted that a number of the seriologies were negative.  (Id.)  "She stated that no further intervention or diagnostic procedures were indicated."  (Id.)

Dr. Szcezch testified at her deposition that she had ruled out numerous possible causes of Plaintiff's kidney disease, namely the nephritic group (as opposed to the nephrotic group) of diseases, including "Membranoproliferative glomerulonephritis [(']MPGN[')], IGA nephropathy, Lupus, Alport's disease, Wegener's granulomatosis, [and] Goodpasture's Syndrome," and ultimately decided against performing a biopsy because she perceived a risk of dangerous bleeding as a result of the procedure and little benefit to knowing the precise cause of the disease given that the course of treatment would be unaffected.  (Szcezch Dep. at 59:16-64:9.)  Dr. Szcezch further explained that she believed that, even if a biopsy had been performed and it had revealed a treatable condition, and the subsequent treatment had had an "efficacy . . . of 100 percent" and been "absolutely successful," it would nevertheless have left Plaintiff "with a creatinine of five"[5] and "he

---

[4]  Presumably, this is a reference to the second renal ultrasound, "suggested" by Dr. Szcezch on August 26, 1997.

[5]  Dr. Szcezch explained that "kidney function and creatinine [are] not linearly related" and thus "[t]he difference between [creatinine of] one and [creatinine of] two is the difference between a hundred percent [kidney function] and fifty percent [kidney function]" and "the difference between [creatinine of] five and [creatinine of] six is a sneeze.  It's just miniscule," indicating that creatinine of five or six represents minimal kidney function. (Szcezch Dep. at 72:13-16.)  Dr.

would have progressed to end-stage renal disease without a doubt in [her] mind" and delayed dialysis by only "a matter of months." (Szcezch Dep. at 74:3-75:5.) Such a minimal potential benefit from performing a biopsy was, in Dr. Szcezch's opinion, not "worth the risk of bleeding[,] the risk associated with the therapies" for treating any treatable condition that may have been found, or the risk of infection. (Id. at 75:4-17; see also id. at 75:20-25 (the potential to keep Plaintiff off dialysis for a few more months "would have come at a much greater cost than the benefit").)

On September 4, 1997, Dr. Dubey saw Plaintiff and "noted a 'stable creatinine of 5.5'" and "cleared him for discharge from a renal standpoint." (Silberzweig Report at 3 (quoting "St. Agnes p. 00035," submitted as Def.'s 56.1 St., Ex. 1, ST.AG000035).) On September 7, 1997, Dr. Dubey "suggested proceeding with AV fistula creation [in preparation for hemodialysis] prior to discharge." (Silberzweig Report at 4.) Plaintiff was discharged on September 17, 1997 (Def.'s 56.1 St. ¶ 1; Pl.'s 56.1 St. ¶ 1), and began dialysis in November 1997 (Def.'s 56.1 St. ¶ 5).

Plaintiff's expert retained for this litigation, Dr. Silberzweig, finds many faults with the care that St. Agnes provided to Plaintiff. In particular, Dr. Silberzweig opines that St. Agnes failed to adequately treat Plaintiff's dehydration in that he was given too little IV fluid, the wrong kind of fluid, and the IV fluids were discontinued too early. (Silberzweig Report at 7.) Dr. Silberzweig also notes that St. Agnes did not strictly monitor Plaintiff's "Is and Os" and opines that as a result St. Agnes's staff mistakenly concluded that Plaintiff had insufficient urine output to tolerate a higher rate and prolonged provision of IV hydration. (Id.) Dr. Silberzweig also faults St.

---

Szcezch concluded that the range of Plaintiff's creatinine, which was approximately 4.8 to 6.0 (in fact it ranged from 4.7 on August 27, 1997, to 6.1 on September 17, 1997 (Silberzweig Report at 2, 4), but Dr. Silberzweig stated in the evaluation portion of his report that it had ranged from 4.8 to 6.0 (id. at 6)), over the course of his admission demonstrated that his kidney function was "quite stable." (Szcezch Dep. at 72:1-9.)

Agnes's failure to take notice of the indication of "more of an acute component to [Plaintiff's] kidney disease [that] should have prompted a more aggressive search for reversible causes of acute kidney injury" which "would have confirmed the diagnoses of dehydration and urinary tract infection." (Id.) Such diagnoses, according to Dr. Silberzweig, "could have led to arrest and reversal of the acute component of [Plaintiff's] kidney disease." (Id.)

Dr. Silberzweig asserts that Dr. Szcezch's decision to not perform a renal biopsy prevented her and the other St. Agnes doctors from discovering Plaintiff's "underlying pathology." (Silberzweig Report at 7.) He opines that according to "the ultrasound reports," and in light of the normal size of Plaintiff's kidneys at the time, "a biopsy would have been feasible." (Id. at 8.) Dr. Silberzweig notes that "[t]he physicians' notes never indicate that they personally examined the ultrasound films" and asserts that "such an examination should have been carried out to determine the feasibility of a kidney biopsy." (Id.) Had a biopsy shown "the [FSGS] that Dr. Szczech [sic] anticipated, Mr. Candelaria's course at St. Agnes would have been unaffected." (Id. at 7.) However, "had it shown a different diagnosis like membranous nephropathy or [MPGN], specific therapies including steroids and other immunosuppressive agents might have been employed with the anticipation of arresting the progression of [Plaintiff's] disease and possibly reversing it." (Id. at 7-8.)

Dr. Silberzweig asserts that the results of a urinalysis which revealed the presence of *Staphylococcus epidermidis* "indicate the presence of a urinary tract infection." (Silberzweig Report at 7.) He further opines that, in light of other aspects of Plaintiff's medical condition and personal circumstances, the presence of this microorganism "should have been interpreted as indicative of a urinary tract infection." (Id.) Dr. Silberzweig remarks that the infection, which "was never noted or treated" by the St. Agnes doctors, "required but did not receive treatment with

antibiotics" and that "[s]uch treatment would likely have led to improved kidney function." (Id.)

Finally, Dr. Silberzweig discusses a number of other errors he perceives in the care provided by St. Agnes, including the failure to "note[], evaluate[] or treat[]" anemia that set in near the end of Plaintiff's hospital admission, the treatment of which "might have resulted in slowing of the progression of [Plaintiff's] chronic kidney disease" (Silberzweig Report at 7), the administration of phosphosoda, despite its contraindication, "likely contribut[ing] to accelerated progression of kidney disease and cardiovascular disease" (id. at 8), the general failure to pay any attention to Plaintiff's "loss of 20-25% of his kidney function" over the course of his admission at St. Agnes (id.), and the failure to "hold his discharge until Mr. Candelaria's creatinine level was stable" despite "numerous notes from the Renal physicians indicating a desire" to implement such a hold (id.). Dr. Silberzweig concludes that, "[i]f Mr. Candelaria had received appropriate care, his kidney function could have been preserved for an additional 12 months or longer" (id.) and that, as a result of the inadequacies that he perceives in Plaintiff's treatment at St. Agnes, Plaintiff's "life expectancy has been reduced by approximately four years" (id. at 10).

## DISCUSSION

Summary judgment should be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is therefore entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is considered material "if it 'might affect the outcome of the suit under the governing law,'" and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The moving party bears the burden of establishing the absence of any genuine issue of material fact. Anderson, 477 U.S. 242 at

256. However, "[t]he party against whom summary judgment is sought . . . 'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.'" Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).  The Court must construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of the non-moving party.  Spinelli v. City of New York, 579 F.3d 160 (2d Cir. 2009).

The Eighth Amendment "establish[es] the government's obligation to provide medical care for those whom it is punishing by incarceration." Estelle v. Gamble, 429 U.S. 97, 103 (1976).  "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." Id. at 104 (internal citation omitted).  However, inadvertence, negligence, or medical malpractice, alone, do not constitute deliberate indifference within the meaning of the Eighth Amendment. Id. at 105-06.  A deliberate indifference claim requires a showing (1) that the harm resulting from the inadequate medical care was "in objective terms, sufficiently serious," and (2) that the defendant acted "with a sufficiently culpable state of mind."  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).  The second, subjective, element requires a showing that the defendant "'kn[e]w of and disregard[ed] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"  Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  Thus, in order for the defendant's mental state to fall within this definition, he need not know that the harm will result from his act or omission, but must know that there is a substantial risk of such a result.  See Farmer, 511 U.S. at 842.  This standard is

"equivalent to subjective recklessness, as the term is used in criminal law." Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006) (citing Farmer, 511 U.S. at 839-40). "The reckless official need not desire to cause [serious] harm or be aware that such harm will surely or almost certainly result. Rather, proof of awareness of a substantial risk of the harm suffices." Id. (citing Farmer, 511 U.S. at 835).

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." Farmer, 511 U.S. at 842. Thus, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. A risk may be sufficiently obvious to support an inference of knowledge when, for example, it has been persistent or expressly acknowledged in some way and the defendant was "exposed to information concerning the risk and thus 'must have known' about it." Id. at 842-43 (internal quotation marks and citation omitted); see also id. at 852 (J. Blackmun, concurring) (citing the majority opinion for the proposition that a defendant "may be held liable for failure to remedy a risk so obvious and substantial that the officials must have known about it").

The serious harm upon which Plaintiff's claim rests is the premature loss of his kidney function, and as a consequence the anticipated reduction of his life expectancy by approximately four years. The Court assumes, for the purpose of this motion practice, that Plaintiff indeed suffered this harm as the result of inadequate care – that Plaintiff's kidney function could have been preserved had Defendant undertaken the course of treatment described by Dr. Silberzweig – and that such harm is sufficiently serious to satisfy the objective element of the deliberate indifference claim. The Court must now determine whether there is a genuine issue of material fact as to whether St. Agnes's medical staff knew that Plaintiff faced a substantial risk of

prematurely losing his kidney function if they did not perform the procedures advocated by Plaintiff.

Plaintiff argues that his doctors failed to diagnose or treat three separate conditions that contributed to his injury, namely dehydration, an acute component to his kidney disease, and a urinary tract infection. While the evidence upon which Plaintiff relies raises questions about the quality of care provided by the St. Agnes doctors, it fails to raise any question about whether, or to support an inference that, the doctors actually knew of the conditions that Plaintiff contends they should have identified and treated at the time of their alleged failures or of the resulting risk of harm to Plaintiff. In particular, Dr. Silberzweig's report is replete with assertions that the St. Agnes doctors "should have" done numerous things differently, but is notably silent as to any indication that the doctors were aware of the facts upon which Dr. Silberzweig based his conclusions, inferred from those (or any other) facts that Plaintiff was at a substantial risk of suffering the harm identified by Dr. Silberzweig, or even that any of those facts or risks were so obvious from the circumstances that the St. Agnes doctors "must have known" about them.

Dr. Vyas determined that Plaintiff was dehydrated when he arrived at St. Agnes, and proceeded to treat and monitor the dehydration for some time. However, there is no evidence that Dr. Vyas, or anyone else at St. Agnes, believed that Plaintiff was still dehydrated when, on August 27, 1997, the provision of IV fluids was cancelled. Indeed, on the basis of the discontinuation of the IV fluids at that time, Plaintiff's own expert "assume[d] that the doctors taking care of [Plaintiff] felt he was well hydrated at that point." Similarly, there is no indication in the record that the St. Agnes doctors knew or believed that the IV fluids provided to Plaintiff from August 25 to August 27, 1997, were insufficient or of the wrong kind. Plaintiff has failed to raise a genuine issue of fact as to whether the St. Agnes doctors knew of Plaintiff's dehydration after August 27,

1997, or that the manner in which they treated the dehydration prior to that date posed a substantial risk of harming Plaintiff.

Plaintiff has proffered evidence that could support an inference that the St. Agnes doctors knew, or at least suspected, that Plaintiff's kidney disease had an acute component. However, Dr. Szcezch determined that the acute condition was FSGS, and Dr. Silberzweig opined that, if that had been the case, "Mr. Candelaria's course at St. Agnes would have been unaffected." (Silberzweig Report at 7.) Plaintiff contends that St. Agnes should have conducted a renal biopsy in order to determine conclusively the nature of the acute component of his kidney disease. Dr. Szcezch claimed at her deposition that she had ruled out a number of acute conditions, including MPGN, and as a result believed that a biopsy would not reveal any of the acute conditions that Dr. Silberzweig identified in his report. Thus, while Dr. Szcezch knew that such a biopsy would enable her to make a conclusive diagnosis, she testified that she believed that there was limited value in making such a determination because it would not change the course of treatment and it would be outweighed by the potential harm from the biopsy, namely the risk of bleeding that would be difficult to control.

Not only is there no evidence that Dr. Szcezch or any other doctor knew that Plaintiff faced a risk of harm from an acute component of his renal disease that a biopsy might identify and help to treat, but there is evidence that Dr. Szcezch specifically rejected the possibility that such a risk existed and concluded that performing the biopsy itself posed a risk to Plaintiff's health. Furthermore, the considered determination that a biopsy was unwarranted, like "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated[,] is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Estelle, 429 U.S. at 107. "At

most it is medical malpractice, and as such the proper forum is the state court . . . ."  Id.

Dr. Silberzweig opined that the August 29, 1997, results of the urinalysis which revealed the presence of *Staphylococcus epidermidis* "indicate the presence of a urinary tract infection."  (Silberzweig Report at 7.)  Dr. Silberzweig remarked that the infection "was never noted or treated" by the St. Agnes doctors.  (Id.)  Dr. Szcezch confirmed at her deposition that she did not seek to treat Plaintiff for an infection upon receiving the urinalysis results, explaining that she did not deem the presence of *Staphylococcus epidermidis* to indicate a urinary tract infection in light of the absence of "white cells," leukocyte esterase, or nitrates.  (Szcezch Dep. at 82:3-11.)  There is therefore no evidence that Dr. Szcezch, or any St. Agnes doctor, believed Plaintiff to have had a urinary tract infection or that the presence of *Staphylococcus epidermidis* in his urine posed a substantial risk of harm to him.

Dr. Silberzweig's critique of the care provided to Plaintiff while he was at St. Agnes arguably suffices to raise genuine questions as to whether the treatment that Plaintiff received was inadequate and whether the harm that he suffered as a consequence was sufficiently serious so as to satisfy the objective component of the deliberate indifference standard.  However, neither Dr. Silberzweig's report nor any other evidence in the record before the Court raises an inference that the St. Agnes's doctors' knew of and disregarded a substantial risk that Plaintiff would suffer earlier than necessary renal failure and a shortened life span as a result of the treatment that they provided.  Neither Plaintiff nor Dr. Silberzweig, in his report, have identified any document in Plaintiff's medical records indicating that the St. Agnes doctors were aware of the risk of such harm arising from the course of treatment they pursued.  Furthermore, while Dr. Silberzweig perceives many flaws and omissions in the care provided at St. Agnes, he has not suggested that Plaintiff's doctors were aware of facts that made the potentially harmful nature of their treatment so obvious

that they "must have known" of the risk that such treatment presented. There is therefore no evidence in the record raising a genuine issue of fact as to the subjective component of Plaintiff's deliberate indifference claim. Defendant St. Agnes is therefore entitled as a matter of law to judgment in its favor dismissing Plaintiff's Section 1983 claim against it.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted. Plaintiff's Section 1983 claim is dismissed, and the Court declines to exercise supplemental jurisdiction of the state medical malpractice claim. Plaintiff's motions are denied as moot. This Memorandum Opinion and Order resolves docket entry nos. 136, 144, 148, and 157. The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum Opinion and Order and close the above captioned action.

SO ORDERED.

Dated: New York, New York
March 29, 2010

LAURA TAYLOR SWAIN
United States District Judge